UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHARON SCHRAM,

                Plaintiff,                  Case Number 16-14312

v.                                       Honorable David M. Lawson

DOW CORNING CORPORATION,

                Defendant.

_____/

## OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

Plaintiff Sharon Schram filed a complaint alleging that she was illegally forced out of her job at defendant Dow Corning Corporation after having worked there for nearly thirty years. Her termination, she contends, was in retaliation for exercising her rights under the Family and Medical Leave Act (FMLA) and the state's workers' compensation laws, and amounted to gender and disability discrimination. Dow Corning has moved for summary judgment, contending that Schram's separation was for performance issues, and the record does not support Schram's claims. But a fair reading of the record at this stage of the case, which requires viewing the evidence in the light most favorable to the plaintiff, yields plenty of evidence supporting the four counts Schram pleaded in her second amended complaint. The motion for summary judgment, therefore, will be denied.

### I. Facts and Proceedings

The basic facts of the case are not unique. Within several months after Schram changed positions within the company and began reporting to a new supervisor, she was removed from her latest position — despite very good performance evaluations — and ultimately terminated from a temporary position to which she was reassigned. Her poor treatment at the hands of the company,

she says, began after she was injured on a business trip and took time off on her doctor's advice for treatment of a detached retina. She sought to have her medical bills paid by the company. She says that when she returned to work, her supervisor questioned whether she still could do the job. Her position was backfilled by a male, who was paid $40,000 more per year for doing the same work. Her second amended complaint includes counts titled as FMLA retaliation, disability discrimination under Michigan law, retaliation under Michigan's Worker's Disability Compensation Act, and gender discrimination under Michigan's Elliott-Larsen Civil Rights Act.

The facts of the case are complex and the record is sizable. A summary — a lengthy one — follows.

## A. Plaintiff's Career at Dow Corning, 1991-2013

In May 1986, plaintiff Sharon Schram started her career with the Dow Corning Company working as a contract employee in the information systems management division. In January 1991, she was hired into a permanent position as a program analyst. She was promoted and worked for the company in various roles until her last position was eliminated and she was "forced to retire" in 2016. She holds a bachelor's degree in marketing management, and in 2001, while working for Dow Corning, she earned an MBA degree from Northwood University. Schram testified that she "excelled" as a system analyst and was "sought ought" by various business units within the company for her assistance with implementing technology systems such as the enterprise management package "SAP" in different divisions.

In 2001, Schram took on a new role as a product market coordinator. She continued to work in marketing roles for approximately ten years; and by 2008 she was responsible for more than $1 billion in sales of various products to customers in "aviation, mold making, electronics, and several

other markets." All of Schram's marketing experience was in the segment Dow Corning refers to as "Industrial Assembly and Maintenance" or "IAM." Among other things, Schram developed market plans, built relationships with customers and distributors, and worked with manufacturing divisions to make sure that products were appropriately priced and profitable. Schram was responsible for more than 2,000 products sold through 200 distribution partners to more than 1,000 customers. In 2009, Schram was asked by Dow Corning's Chief Marketing Officer to apply her business and systems expertise to a new role as a "business center analyst," which she performed from 2009 through the end of 2013. During that time Schram was promoted from "level 4" to "level 5." She also received annual pay increases that were based in part on her performance.

## B. Reprise of the IAM Regional Marketer Role, 2014

In December 2013, Dow Corning manager Joy Govitz contacted Schram by email and wrote that she had been given Schram's name as a candidate to fill one of several openings in the marketing organization. At the time Schram was "perplexed" by the inquiry, but not "surprised," since she "had been sought out for nearly every role [she] had in Dow Corning." Govitz implored Schram to accept the position, telling her during phone conversations that "[w]ith your skill set, you would be perfect for this role," "you've done this job for 10 years," and "I really want you to take [the job]." Govitz also told Schram that she already had secured approval from Schram's supervisor for the reassignment. However, Schram was not interested in moving to another position at the time, and she told Govitz as much. Nevertheless, Govitz persisted, first telling Schram that she could not go on vacation until the position was filled, and then warning Schram (falsely) that Schram's position in the business center was being eliminated and she would not have a job if she did not accept the reassignment. Govitz also told Schram that she and her husband, who evidently also

worked for Dow Corning, would "make [Schram's] life miserable if [she] did not take this role." Finally, on December 18, 2013, after her third phone call with Govitz, Schram reluctantly accepted the position. Later, after the holidays, Schram spoke with her supervisor in the business center, who told Schram that she supported the move, but that Schram's job was not being eliminated and she did not have to accept the reassignment if she didn't want to. Schram's supervisor told her she did not want Schram to leave because she was a "great worker" and a "high performer."

Schram testified that during her tenure in the business center, there had been a lot of turnover in the IAM "market leader" role to which she was returning, and she felt she was "starting over," tasked with recovering significant losses in market share and customer relations that had resulted from "inconsistent" efforts by the interim tenants of the position. Even before Schram returned to the market leader position, she had received a number of calls over the years from distribution partners and customers with whom she maintained relationships, asking her if she would consider returning to the role to get things back on track. Schram had reservations about the lack of direction within Dow Corning with respect to IAM marketing, but she began her work from a "blank sheet" over her holiday vacation in 2013, preparing a market plan, which she discussed with Govitz. Schram noted that the IAM marketing function had not had such a plan in place since she left the market leader role in 2009.

By the end of January, Schram had "completed a market plan for the following year," and she "received kudos" from Govitz for her efforts. Despite her misgivings about how Govitz had recruited her into the role, Schram decided to "move on," and she felt that she and Govitz got along well. Schram said she thrived in her reprised role, working with "stakeholders" in other divisions throughout the company, and in several instances she was asked by the "global segment leader" for

IAM marketing to lead global marketing efforts. Schram often traveled with Govitz, and they met at least monthly to discuss the projects that Schram was working on and her progress on them. Schram and Govitz also often met socially for lunch or to have drinks after hours.

On her mid-year review for 2014, Govitz wrote of Schram's performance: "Sharon transitioned into this role during Q1. She was immediately asked to pull together a 4P Plan for North America and South America markets. She did a great job working with the respective individuals to meet the requirements. Critical for H2 is the channel project." However, Govitz also wrote in Schram's review that Schram would "need to ensure that her past experience within the segment does not heavily influence her thoughts to drive a quick decision or hinder her ability to be open minded," and that a white paper Schram had prepared "did not represent information based on unbiased facts," and "[g]oing forward, [Schram] will need to ensure team input/consensus and [that] factual information is shared to build [a] final business case; otherwise, the work presented will not be deemed credible." Schram felt those criticisms were unfair or unfounded, because Govitz had told Schram she wanted her to return to the role because of her previous experience doing the job. Moreover, the white paper in question had been completed months before, with revisions and comments by Govitz, and Govitz had approved the final draft. Schram also was confused by the negative comments in the review, because during the month when she was reviewed, Govitz was "telling me I'm her rock star."

### C. Plaintiff's Eye Injury and Medical Leave

On August 14, 2014, Schram was on a flight from Bay City, Michigan to Dallas, Texas. While she was disembarking for a layover in Detroit, another passenger on the flight "yanked down" a bag from an overhead compartment, which fell and struck Schram on the left side of her forehead,

just above her brow. The blow hurt, but Schram initially "didn't think twice about it." When she arrived in Dallas, Schram proceeded as scheduled and met with two of her customers; however, at lunch one of her customers told Schram "there's blood in your eye," which sent Schram to a bathroom where she confirmed that she could see it in the mirror. She proceeded on another flight to Houston, Texas, arriving around midnight, and in the morning she noticed that the spot of blood in her eye was gone. During her travel back to Midland, Schram noticed while looking out the window of the plane that there were "floaters" in her field of view that were not present before.

On the evening of September 7, 2014, Schram noticed a "flash" in her vision, which quickly dissipated. She continued working to wrap up a presentation she was scheduled to give the next day and did not think any more about it. Schram made her presentation to the leadership team the next day, and got "rave reviews." However, after the meeting, Schram called her optometrist and told him something seemed wrong with her eye; he scheduled an appointment for her to be seen a week later on September 17th. After examining Schram, the optometrist told her that she had a retinal detachment, and he referred her for a same day follow up with an ophthalmologist, who confirmed the diagnosis. The second doctor told Schram she would need emergency surgery to repair the detachment, or she could lose the vision in her left eye.

After she was scheduled for surgery the next day, Schram went out to her car and called Govitz on her cell phone; she informed Govitz she needed emergency surgery to correct a retinal detachment. Govitz replied, "You're not going to pin this on me," which Schram interpreted as concern that the injury would be a topic at the next company safety meeting, since Schram previously had informed Govitz that she suffered a blow to the head while on her Dallas trip (before Schram was aware that she had a retinal detachment). Govitz told Schram that she had "objectives

to complete" and that she should "postpone the surgery." Schram responded that she could not postpone it because she could go blind if the detachment was not repaired, and Govitz replied, "I don't think so." Schram told Govitz she would let her know more details about her condition after the surgery, and she went ahead with the treatment the next day. After the surgery, Schram was transported home and was "incapacitated" for several days, since she had no vision in her left eye for "more than a week," and had frequent doctor's appointments to treat the detached retina.

Despite her condition, Schram sent an email to Govitz later on September 18, 2014, informing Govitz that she had no vision in her left eye and would be unable to drive until September 29. Schram also stated that she had her computer at home but would have only limited use of it due to her restricted vision. Govitz responded on the following Monday, writing: "Thanks, Sharon, for letting me know. I hope recovery is going well. I'll see you when you get back." Schram subsequently provided a doctor's note to Govitz indicating that she could not return to work until the 29th.

Despite her reduced vision and limited ability to use her laptop computer, Schram testified that she was able to work from home, and that she "met her commitments" while she was off from work for recovery. Schram logged 10 days of leave, which she considered to be "sick days" and which were reported as such. Schram testified that she had taken FMLA leave in the past for the birth of a child, and she knew how to request FMLA leave, but she could not recall whether she requested it for her surgical recovery. She was sure, however, that Govitz never offered her the option of FMLA leave. Nobody at Dow Corning ever indicated to Schram that they considered her to be on FMLA leave before she returned to work; however, the only person Schram communicated

with about her surgery was Govitz. Schram had follow-up appointments with her surgeon "daily" at first, and then every other day, until her final visit sometime shortly before she returned to work.

On September 26, 2014, Schram had a follow-up appointment with her surgeon, who discovered that the "bubble" in her retina had not fully subsided. He told her then that she could not return to work until October 6. Schram emailed Govitz to inform her of the extended leave, which "upset Joy considerably," because it meant that Schram would miss an important global marketing meeting that was set for the day she was to return. Govitz told Schram that if other people who were traveling to attend the meeting from as far away as California could make it, then Schram could make it too. However, despite her absence from the global meeting, Schram attended all of her other scheduled commitments, such as teleconference meetings; for one of those events she "received . . . kudos from the field [for being able] to step in" and provide needed information to distributors. On October 6, 2014, Schram returned to work as scheduled.

Schram says her vision mostly has returned to normal, but she still cannot drive at night because she sees "halos" around lights. She also can't participate in recreational activities that she used to enjoy, like snow skiing and water skiing, since she must avoid the risk of a repeated injury to her eye.

### D. Plaintiff's Return to Work

Schram testified that her return to work was "seamless," and "[m]ost people [she] worked with were not even aware that I missed a beat." Govitz asked Schram when she returned to work if Schram would be able to do her job, and Schram stated that she would, "absolutely." However, after Schram returned to work, Govitz no longer met with her monthly as previously scheduled, and Schram no longer was included in or invited to social events that Govitz and other co-workers

attended. Govitz repeatedly gave excuses to avoid meeting with Schram, including one time when she had a "family emergency," which evidently meant that Govitz needed to leave work to have her hair dyed from blonde to brunette. Schram tried repeatedly to discuss her work with Govitz, but Govitz still refused to meet with her. She also tried to meet with Govitz's superior, Diane Kelly, who declined and told her that Govitz was her manager and Schram should meet with her instead. Shortly after Schram returned to work, Govitz also moved Schram from her 15' x 20' office with a "courtyard view" to a 6' by 6' cubicle "next to the co-ops." Govitz also told Schram on the day she returned to work that she was "selected to do a drug test today," which would occur in one hour. Govitz also frequently questioned Schram's work activities, asking her repeatedly why she was meeting with specific people or spending time on certain tasks.

After six to eight months, Schram's vision returned to near normal. During that period, she had some problems at work navigating stairs, due to her limited depth perception, and she requested a large monitor so that she could see her computer better when working at her desk. However, Govitz was uncooperative when Schram requested a larger monitor. On October 10, 2014, Schram was in a group meeting with co-workers and Govitz, and, while sitting across the table from Schram, Govitz said, "Do you see me here? Here I am. Sharon, I'm over here." Schram felt that those comments were "inappropriate" for a manager to make.

### E. Plaintiff's "Redeployment"

Meanwhile, it appears that within a couple months after Schram returned to work, discussions were underway to replace her with a male, Gifford Shearer, from another Dow subsidiary. From the testimony, it appears that none of the Dow Corning supervisors are ready to take responsibility for that decision.

Diane Kelly, who was Govitz's superior in the marketing organization, testified that she decided in early 2014 that she would retire from Dow Corning in March 2015. Kelly was replaced by Christian Velasquez. Kelly testified that she was aware that "there were discussions in regard to possibly how we would backfill the position" left open by Schram's impending "redeployment," and that Velasquez was part of those discussions. However, Kelly did not make the "final decision" regarding Schram's replacement, since she was in the process of retiring; the final decision, according to Kelly, was made by another Dow Corning manager named Eve Luo. Kelly testified, however, that she had been aware in 2014 that Schram was out on a medical leave due to her eye surgery.

Christian Velasquez testified that he worked as a market director for Dow Corning or Dow Chemical for 25 years. He took over Kelly's role in January 2015 and supervised her former staff for three or four months. Velasquez had "some discussions" with Kelly about "placing [Shearer] in the position . . . of NA IAM marketing," but he asserted that the "final decision" was Kelly's, not his. However, Velasquez conceded that he had "some input" on the decision.

Velasquez testified that he knew Gifford Shearer (Schram's replacement) for around 10 years. Before 2015, Shearer worked for "Multibase," which is a wholly-owned subsidiary of Dow Corning. Velasquez stated that Shearer was at the time looking for a new position since his job duties at Multibase were being split and assigned to other staff there. Velasquez admitted that Shearer assumed all of the duties of Schram's former IAM position after Schram left. Shearer also was designated in Dow Corning's HR system as a "regional marketer," which was the same job title Schram had held. Velasquez testified that Shearer was paid more than Schram after his reassignment because, in addition to taking over Schram's duties, he also still "had some obligation

in the management of Multibase," where he formerly had been the president.  However, the carry-over of duties from Multibase evidently was short-lived, because Velasquez admitted that Shearer's Multibase tasks ended within six months after he was assigned to the IAM position at Dow Corning.

Velasquez authenticated an email that he was copied on, which was sent to Eve Luo, who was a marketing director at Dow Corning, reporting to the Chief Marketing Officer, Dan Futter.  In that email, dated November 14, 2014, Luo was asked by another Dow Corning Manager, Philippe Nobels, if Luo thought that Schram would be a good candidate for a customer service position, indicating that "[a]s we discussed, we would like to free up Sharon and have someone to take the NA IAM marketing role."  Later that same day, Luo replied to the email chain, writing to Nobels, "What you're suggesting for the next steps, can you please work with Joy [Govitz] to proceed it? Thanks."  The next morning Nobels replied to Luo, writing, "No direct action for now. I will continue to follow up with HR colleagues."

The "next steps" toward replacing Schram likely commenced soon after the mid-November email exchange, because on December 11, 2014, Shearer emailed Dow Corning's Human Resource Service Center and asked for a copy of Dow's relocation policy and asked how far in advance he could begin the process of arranging for relocation benefits.  The response to Shearer indicated that he would be allowed to initiate the relocation process after he accepted an offer for a job with Dow Corning.  Another email from Shearer to the human resources department stated: "Thanks, Shannon, I have asked my manager to confirm when *he* wants to start the process." (emphasis added). Velasquez asserted that he could not recall whether he or Kelly made the offer to Shearer, but he conceded that Shearer's message referring to the manager as "he" signaled that Shearer had consulted with Velasquez about the relocation approval.  In a subsequent email on February 2, 2015

from Shearer to Joy Govitz, Shearer asked Govitz if he should fill out the "relocation web form" to

"kick off the process," and he also wrote that he needed to know "my new cost center" (the

accounting unit to which his position was assigned).

It is clear from the record that Schram was not informed of any of these machinations. The

plaintiff submitted another email string from mid-December on which Nobels, Velasquez, Govitz,

and Dow Corning Human Resources staffer Melissa Dabrowski were copied. Nobels, responding

apparently to an earlier exchange with Govitz, wrote as follows:

> Joy, I would recommend to wait until early Jan to let [Schram] know she is on [the] redeployment list and to start the 60 days clock. This will be more fair as the coming weeks will be difficult to engage others for redeployment (with end of year break). Now you may (informally) encourage her to look at options and apply for open positions. It's a little bit ambiguous but I try to find the best way for DC and the employee.

Plf.'s Resp., Ex. 17, Email string dated Dec. 15-17, 2014 (Pg ID 808). Velasquez then replied:

> I disagree with this timing of waiting. We need to start this happening now and that means we need to communicate with her now so that we can make our other stacked decisions in our region. We are already asking her to look at other jobs, so I think we should be clear now.

*Ibid.* Nobels then replied, "OK Chris — I understand your point but I want the clock to start 1 Jan

and not now to be fair to her." Both Govitz and Velasquez, as well as HR staffer Dabrowski and

Kelly, were copied on that entire email exchange.

On December 19, 2014, Govitz sent an email to Dabrowski with a proposed "redeployment

letter" for Dabrowski's review. Dabrowski commented in response that she thought the first

paragraph should read "Your skills are not currently aligning with the needs that we have for the

Regional Market Leader position." Govitz followed up with an email on December 30, 2014,

reporting to Dabrowski an "update" stating that she had spoken with Schram, "informed her that due

-12-

to her skills that she is not currently aligned with the need of the role and she will be put on redeployment at the beginning of the year." Govitz reported that Schram "told me she was confused because last Dec ('13) we offered her the role because she knew the job and market the best. Now, just 1 year later, we are telling her that her skills do not align."

Schram testified that Govitz sent her an email on December 19, 2014 asking if Schram had time to talk that afternoon. When they met that day, Govitz told Schram that her "job had been eliminated," but that Govitz would "do [her] a favor and allow [her] to be redeployed." Govitz did not offer any details on when Schram would be "redeployed" or why her job was eliminated. Schram was puzzled because she had just attended a marketing meeting the same morning where "IAM was at the top of the list" and seemed to be "the market right now that everybody wants to be a part of," largely due to Schram's efforts to bring order to the segment since she had returned. Schram told Govitz she could not understand why her job was being eliminated, particularly after Govitz had given her two cash awards in 2014 for exceeding expectations, and she expressed to Govitz that "to think that this channel could be resolved in just a matter of months that had been years and decades in turmoil was ridiculous."

Govitz at some point told Schram that she would be put on the "redeployment list" and would have 60 days to find another job within Dow Corning. However, Schram subsequently met with "over 70 Dow Corning managers" in January 2015, and she was told by them that she was "not in the redeployment pool" and therefore was "not eligible for a job in their organization[s]." One of Dow Corning's "talent mangers" who met with other human resources staff weekly to review the redeployment list and try to locate openings for those on the list also told Schram that she was not in the redeployment pool. Govitz also started refusing to approve Schram's expense reports after

she was supposedly "redeployed" in January 2015, which caused Schram to have her work credit card declined, so that she had to pay out of pocket and get reimbursed for work expenses.

Schram ultimately was unable to find another permanent position within Dow Corning since she was told by all the units she applied to that she was not in the redeployment pool, and eventually she accepted a temporary position in another business unit, since she was unable to secure any permanent job. It appears that temporary position was eliminated by Dow Corning in 2016, after Dow Corning was acquired by Dow Chemical, at which time Schram was "offered a severance" and, according to her, "forced to retire." Schram was told by her interim supervisor in that position that "it was obvious [she] was a bad employee or [she] would not have been redeployed." Schram testified that her mid-year performance review for 2014 indicated that she was meeting all of Govitz's expectations for 2014, until she went out on medical leave, which was inconsistent with Govitz's claims that she did not meet any expectations after she returned. However, in January 2015 Govitz prepared a "final" performance review for Schram in which she wrote that Schram was not meeting any expectations of her position. Schram discussed that evaluation with Govitz's superior, Diane Kelly, who told Schram that she believed the evaluation was unfair; Kelly also said that she would talk to Govitz about it. Schram testified that in her 29 years working for Dow she had never received a "not met" comment for any expectation on a performance review.

### F. Plaintiff's Replacement (Gifford Shearer)

Gifford Shearer testified that he worked for Multibase in various positions following his graduation from university in 2000. Shearer began as an application engineer, later became a technical manager supervising other engineers, and eventually moved into a "business development" role, in which he was responsible for "selling . . . silicon thermoplastics into consumer electronics

-14-

applications."   In 2012, after Multibase was acquired by Dow Corning, Shearer moved into a position in marketing, and he has continued in that role to the present.   Shearer testified that Diane Kelly was his "manager" at Dow Corning until she retired in November 2014, and then he "was reporting to Chris [Velasquez]."

In January 2015, Velasquez contacted Shearer and "asked [him] to take on the new marketing responsibility for what was called industrial assembly and maintenance."   Shearer accepted Velasquez's offer, and he "began reporting to Joy Govitz" in March 2015, then "transitioned full-time to that role on April 1."   Shearer stated that he had not worked in the "industrial marketing" segment before he took over the IAM role in 2015.   Shearer testified that after he transferred to the IAM role, his job title was "regional marketer for industrial assembly and maintenance," and, when asked "who held that position prior to you," Shearer answered, "Sharon Schram."   Shearer stated that he never met with Schram and never was told anything about why she was leaving the IAM position.   Shearer's current salary in the IAM job is $144,000 per year.

### G.  HR Complaint and Investigation (2015)

Schram submitted a complaint to the Dow Corning Human Resources department in January 2015, based on her "concerns related to her 2014 year end PIP review."   Dow Corning HR Manager Jen Stange investigated the complaint and prepared a report, which noted that Schram stated she was surprised by the negative evaluation she received in January, since she had received "raving reviews" from other managers at Dow Corning about her performance.

Stange also stated that she spoke with Philippe Nobels "to document the process used to identify Sharon Schram to go on deployment."   Stange reported that Nobels told her that another regional market manager, Paul Wisniewski, was going to be left "without a role" as a result of a

"market wind down," and that, because Wisniewski was a "good performer" and Schram was "not a good fit with marketing," "a decision was made based on performance that Paul would 'bump' Sharon out of her role, and she would be given the opportunity for redeployment."

Stange concluded that there was "no evidence of discrimination" in the redeployment decision, but noted that "[c]oaching was provided to the Talent Manager (non-U.S. based) that consultation with U.S. Site HR team was needed on U.S. employment matters on future matters [sic], it is not practice to 'bump' talent out of a role outside of a formal RIF's [sic] in the U.S." The report does not explain why it refers to Schram being replaced by Wisniewski rather than Shearer; Wisniewski was not mentioned in any of the discussions between Nobels and other Dow managers about replacing Schram.

## H. Procedural History

The plaintiff filed her complaint in this case on December 12, 2016, follow by two amendments. The second amended complaint, which was filed by stipulation of the parties on June 30, 2017, pleads claims for: retaliation contrary to the federal Family & Medical Leave Act (FMLA) (Count I); disability discrimination under the Michigan Persons With Disabilities Civil Rights Act (PWDRCA) (Count II); retaliation under the Michigan Worker's Disability Compensation Act (WDCA), Mich. Comp. Laws § 418.301(13); and gender discrimination under the Michigan Elliott-Larsen Civil Rights Act (ELCRA) (Count IV).

Defendant Dow Corning filed a motion for summary judgment, to which the plaintiff responded. The Court heard oral argument on January 4, 2018.

## II. Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

Dow Corning challenges each of the four counts of the second amended complaint.

## A. FMLA Retaliation

Count I of the second amended complaint is titled "Retaliation in Violation of the Family and Medical Leave Act." In essence, that count alleges that the defendant took an "adverse action" against Schram for taking FMLA-qualifying leave to treat and recover from her detached retina.

"'The FMLA affords employees protection in the event they suffer retaliation or discrimination for exercising their rights under the FMLA. Specifically, an employer is prohibited from discriminating against employees who have used FMLA leave, nor can they use the taking of FMLA leave as a negative factor in employment actions.'" *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 376 (6th Cir. 2017) (quoting *Arban v. West Pub. Corp.*, 345 F.3d 390, 403 (6th Cir. 2003) (quotation marks and alterations omitted)).

To establish a case of retaliation under the FMLA, a plaintiff must show that: (1) the plaintiff engaged in activity protected by the FMLA; (2) the employer knew that she was exercising a right under the Act; (3) the employer took adverse action against her after learning that the plaintiff exercised a right under the FMLA; and (4) there is a causal connection between the employee's protected activity and the employer's adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012); *see also Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).

The defendant argued in its motion that the plaintiff's retaliation claim fails because there is no evidence on elements one or three. In response, the plaintiff argues that she requested and took FMLA-qualifying leave, and that the defendant actually *interfered* with her FMLA rights. That response provoked a reply from Dow Corning that the plaintiff never pleaded an FMLA interference claim, and therefore that cause of action is not on the table. It also generated a new (unbriefed) defense argument raised for the first time at the hearing that the plaintiff abandoned her FMLA retaliation claim by not addressing it in the response brief.

### 1. No FMLA Interference Claim Was Pleaded or Proved

The FMLA prohibits employers from interfering with an employee's exercise of rights conferred by that statute, 29 U.S.C. § 2615(a)(1), and from retaliating against an employee who exercises or attempts to exercise those rights, *id.* § 2615(a)(2). *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (recognizing "two discrete theories of recovery under the FMLA: (1) the so-called 'interference' or 'entitlement' theory . . . , and (2) the 'retaliation' or 'discrimination' theory . . . ."). A plaintiff can proceed under both theories, but the pleading and

"proof needed for each claim differs." *Tennial v. United Parcel Service, Inc.*, 840 F.3d 292, 307-08 (6th Cir. 2016).

The Sixth Circuit has allowed plaintiffs to proceed under both theories when the complaint alleges generally that a defendant-employer's actions violated the FMLA. *See Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2006). But the plaintiff has an obligation to plead her claim with enough specificity to put the defendant on notice of the theory of liability it must defend. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (requiring that "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)); *see also Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 551 (6th Cir. 2008) (holding that FMLA claim was not pleaded with sufficient specificity).

The plaintiff's second amended complaint gives no hint that she intended to pursue an FMLA interference claim against the defendant. The title of Count I mentions only "retaliation." At oral argument, plaintiff's counsel directed the Court to paragraph 42, but that states only that the "FMLA prohibits an employer from discriminating and retaliating against an employee" for exercising FMLA rights. And it references only 29 U.S.C. § 2615(a)(2) and 29 C.F.R. § 825.220(c), both of which support retaliation claims, not interference claims.

More importantly, the record does not support an interference claim. "To establish a claim for interference under the FMLA, a plaintiff must demonstrate that (1) he is an eligible employee, (2) the defendant is an employer as defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of his intention to take leave, and (5)

the employer denied the employee FMLA benefits to which he was entitled." *Tennial*, 840 F.3d at 308. "A benefit is denied if an 'employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave.'" *Ibid.* (quoting *Arban v. West Publishing Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)).

The plaintiff has not offered any evidence that she was denied any of the leave that she sought to take, and she does not dispute the defendant's position that its leave policies would have required her to exhaust any paid sick leave and available short-term disability benefits before taking any unpaid FMLA leave. So she has failed to show that she suffered any deprivation of rights under the FMLA that resulted in any "interference" with her leave. The FMLA expressly permits an employer to substitute paid sick leave for unpaid FMLA leave, if the substitution is made according to a leave policy that requires that expedient. *Harrison, v. Proctor & Gamble Distributing, LLC*, No. 15-514, 2017 WL 5523150, at *9 (S.D. Ohio Nov. 17, 2017) (citing 29 C.F.R. § 825.207); *see* 29 C.F.R. § 852.207(a) ("Generally, FMLA leave is unpaid leave. However, under the circumstances described in this section, FMLA permits an eligible employee to choose to substitute accrued paid leave for FMLA leave. If an employee does not choose to substitute accrued paid leave, the employer may require the employee to substitute accrued paid leave for unpaid FMLA leave.").

The plaintiff notified her employer that she would be absent due to her surgery, and when her absence would end, and she took all of the leave that she desired and her doctor recommended. She therefore has not shown that she was denied any medical leave that she sought, regardless of how that leave was denominated. *Tennial*, 840 F.3d at 308 ("Tennial was never denied leave. He was in fact granted it twice, once in 2011 when he was the Twilight Sort's Hub Manager and again in 2012 when he served as a supervisor of the Oakhaven Hub. Nor was he denied reinstatement to

those positions when he returned from leave."); *Hargett v. Jefferson Cty. Bd. of Education*, No. 17-5368, 2017 WL 5664922, at *7 (6th Cir. Oct. 27, 2017) ("Hargett admitted that she had never been denied any requested FMLA leave, either before or after her request for an extension, that no one had ever suggested to her that she had taken FMLA leave inappropriately, and that no one had ever commented negatively about her FMLA leave requests."). The plaintiff testified that she previously took FMLA leave for the birth of a child and knew how to request it, but she has not put forth any evidence that she ever made any request for FMLA leave for her eye surgery, and she asserted at her deposition that she could not recall making any such request.

The plaintiff insists that she may pursue an interference claim because Dow Corning never offered her FMLA leave after it became aware that she had requested leave that could qualify under the FMLA. It is true that the regulations require an employer, who learns that an employee's leave may be FMLA-qualifying, "must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1). And a failure to give such notice may be actionable. However, the Sixth Circuit, consistently with other circuits and the Supreme Court, has held that such failure-to-notify claims are actionable only where the lack of notice causes the employee some harm, such as loss of leave, benefits, salary, or position. *Reeder v. Wayne County*, 694 F. App'x 1001, 1004 n.1 (6th Cir. 2017) ("[A]n employer's inaction in failing to give an employee required notice of his rights under the FMLA may support recovery on an FMLA interference claim *if such failure caused the employee harm*." (emphasis added)) (citing *Wallace v. FedEx Corp.*, 764 F.3d 571, 588-89 (6th Cir. 2014)); *see also Bellone v. Southwick-Tolland Regional School District*, 748 F.3d 418, 423 (1st Cir. 2014) ("Late or inadequate notices . . . are not actionable unless they harm the employee.") (citing *Ragsdale v. Wolverine World*

*Wide, Inc.*, 535 U.S. 81, 90–91 (2002)).  That principle is consistent with the statutory text stating that the employer "may be liable for *compensation and benefits lost* by reason of the violation, for other *actual monetary losses* sustained as a direct result of the violation, and for appropriate equitable or other relief, including employment, reinstatement, promotion, or any other relief tailored to the harm suffered."  29 C.F.R. § 825.300(e) (emphasis added).  The plaintiff has not established that she suffered any harm as a result of the alleged notice failure.

### 2.  FMLA Retaliation Claim

Nothing in the plaintiff's brief suggests that she abandoned her retaliation claim.  To be sure, she did not discuss all the elements of a *prima facie* case for interference, but then neither did the defendant.  Instead, the plaintiff's argument met the defendant's challenge on whether she engaged in protected activity, that is, that she took FMLA-qualifying leave, which triggered her poor treatment at the hands of her supervisor, Joy Govitz, and others.

The record contains abundant evidence from which a jury could find all the elements of a *prima facie* case for retaliation: protected activity, employer knowledge, adverse action, and causal connection.  *Marshall*, 854 F.3d at 381.  "To prove that [the defendant] engaged in FMLA retaliation, [the plaintiff] must show that taking leave was a causal factor in [the defendant's] decisions to demote [or] fire her," which may be shown "through either direct or indirect evidence." *Id.* at 376-77.  The defendant does not dispute that it is a covered employer and the plaintiff was an eligible employee under the FMLA.  It is undisputed that the plaintiff took at least 10 days of sick leave between September 17 and October 6, 2014.  She notified her supervisor, Joy Govitz, that the leave was necessary for her to undergo and recover from surgery to repair a detached retina, which if left untreated threatened a loss of vision in one eye.

The eye injury plainly was "a serious health condition" that made the plaintiff "unable to perform one or more of the essential functions of his or her job."  29 U.S.C. § 825.200(a)(4). "Serious health condition means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a health care provider as defined in § 825.115."  29 C.F.R. § 825.102.  "A serious health condition involving continuing treatment by a health care provider includes . . . [a] period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves [t]reatment two or more times, within 30 days of the first day of incapacity . . . by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider."  29 C.F.R. § 825.115(a)(1).  The plaintiff testified that she had no vision in her left eye for weeks after the surgery, which made her unable to drive or effectively to use her laptop computer, even when working from home.  She also was on a travel restriction prohibiting her from flying even after she returned to work.  She was seen "daily" and then "every other day" during the nearly three weeks she was out of work.  Those circumstances plainly rendered the plaintiff unable to perform at least the "essential functions" of her job of communicating with her co-workers and customers using her computer, and traveling by air for business purposes, as she routinely was required to do.

The defendant's contention that the eye injury was not "serious" or did not impair the plaintiff's ability to perform the essential functions of her job is groundless and unsupported by the record.  The plaintiff therefore adequately has supported her claim that she engaged in protected activity under the FMLA, because protected activity under the act includes both taking FMLA-

qualifying medical leave, *Waag v. Sotera Defense Solutions, Inc.*, 857 F.3d 179, 192 (4th Cir. 2017), and submitting a request for such leave, *Echevarria v. AstraZeneca Pharm. L.P.*, 856 F.3d 119, 134 (1st Cir. 2017).

The plaintiff also has put forth sufficient evidence to suggest that she suffered "adverse actions" sufficient to sustain a retaliation claim, when, following her return from medical leave, Govitz (1) stopped meeting with the plaintiff as previously scheduled to discuss her marketing work, repeatedly refused to meet with her for any business purpose, and excluded her from work-related events to which co-workers were invited; (2) imposed an undue level of minute scrutiny on the plaintiff's work activities, which she never had been subjected to before; (3) within weeks after the plaintiff's return, began agitating for the plaintiff's "redeployment" and replacement by another employee favored by Govitz's new superior; and (4) in order to justify the "redeployment," concocted a severely negative final performance review of the plaintiff, which was unsupported by any substantiated decline in performance, and sharply contrasted with the "kudos" and "rave reviews" the plaintiff had received from Govitz, other Dow Corning mangers, and distribution partners, before she went on medical leave.

"To be adverse, a retaliatory action must be enough to dissuade a reasonable person from engaging in the protected activity." *A.C. ex rel. J.C. v. Shelby County Board of Education*, 711 F.3d 687, 698 (6th Cir. 2013). The acts complained of here were no mere petty slights or annoyances; imposing unfounded negative evaluations and reassigning a 29-year career employee to a temporary position from which she was discharged one year later, when the position predictably was eliminated, certainly comprise consequences that would give any reasonable employee pause in exercising her statutory right to medical leave.

-24-

The defendant contends that the plaintiff never suffered any "adverse action" because she was not (immediately) terminated and eventually found another (temporary) position within Dow Corning, "without ever missing a paycheck." But the "materiality" standard on which the defendant relies for that argument governs the analysis of adversity for discrimination claims, not for claims of retaliation. The Sixth Circuit has observed that "the definition of adverse action is essentially the same" for retaliation claims under statutes such as the ADA and FMLA as that applied to retaliation claims under the First Amendment. *Wenk v. O'Reilly*, 783 F.3d 585, 595 (6th Cir. 2015) (citing *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012) ("In the First Amendment context, . . . we have held that any action that would deter a person of ordinary firmness from exercising protected conduct will [constitute a sufficient adverse action].")). The plaintiff's proofs here easily surpass that more liberal "ordinary firmness" threshold.

The plaintiff also has put forth sufficient evidence to show a causal connection between her medical leave and the ensuing "redeployment" and associated negative performance reviews imposed by Govitz after she returned from leave. It is undisputed that Schram returned to work on October 6, 2014, and the record suggests that Govitz was agitating for her "redeployment" within less than six weeks, as shown by the email exchange between Govitz, her superior Christian Velasquez, and Dow Corning marketing director Eve Luo, in which Luo asked if Philippe Nobels thought that Schram would be a good candidate for a customer service position. The communique indicated that "[a]s we discussed, we would like to free up Sharon and have someone to take the NA IAM marketing role." Govitz claims that she was "not involved" in the redeployment decision, but in the same email exchange, Luo replied to the email chain, writing to Nobels, "What you're suggesting for the next steps, *can you please work with Joy [Govitz] to proceed it?* Thanks."

(emphasis added). Also, in the later email exchange in mid-December, Dow HR staffer Melissa Dabrowski replied and specifically addressed "Joy" (Govitz), contesting what likely was an earlier request by Govitz to begin Schram's redeployment "clock" earlier than Dabrowski recommended. Those exchanges would permit a jury to infer reasonably that Govitz was more "involved" in the decision than she claims, and that she either drove the process, or at least instigated and had substantial input into the plans for it.

The Sixth Circuit "has determined that a two to three month period between protected activity and adverse employment action was sufficient to establish a causal connection." *Frazier v. Richland Public Health*, 685 F. App'x 443, 455-56 (6th Cir. 2017) (citing *Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two. Our precedents stand for the principle that timing matters."); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (three months between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work sufficed to establish causal connection at the *prima facie* stage)). Here, the record amply suggests that Govitz's campaign to oust Schram was well underway within six weeks after Schram returned from her medical leave, and that the decision to replace her was made between mid-November and mid-December, no more than 2-1/2 months after Schram was back to work after her recovery.

Govitz's superior, Diane Kelly, attested in a declaration that it was she who "recommended" that Schram be placed on the redeployment list, and that Govitz "was not involved" in the decision. But those assertions are called into question by Kelly's deposition testimony that she did not make

the "final decision" regarding Schram's replacement, because she was in the process of retiring, and that the "final decision," according to Kelly, was made by Dow Corning manager Eve Luo.

Moreover, the only purported factual basis for the redeployment was Schram's "poor performance" following her return from medical leave, which was document solely by one post-leave negative review from Govitz. The Sixth Circuit has held that the so-called "cats-paw" theory of liability applies to FMLA retaliation claims; under that theory, liability may be established where "a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Marshall*, 345 F.3d at 377 (quotations omitted). Of course, "[i]f the decisionmaker conducts an investigation that 'results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable.'" *Id.* at 380 (quoting *Staub v. Proctor Hospital*, 562 U.S. 411, 421 (2011)). However, "there is no 'hard-and-fast rule' that a decisionmaker's independent investigation defeats a cat's paw claim," and, "an independent investigation defeats a cat's paw claim only when the investigation 'determin[es] that the adverse action was, apart from the supervisor's recommendation, entirely justified.'" *Ibid.* (quoting *Staub*, 562 U.S. at 421). The defendant has not advanced any evidence from the record to suggest that any of the purported decision makers — Luo, Nobels, Kelly, or Velasquez — conducted any independent investigation to verify the supposed abrupt decline in Schram's performance.

There is evidence in the record from which a jury reasonably could conclude that Schram's supposed performance decline was fabricated by Govitz herself, and never questioned by her superiors. The plaintiff testified that Kelly told her the negative evaluation given in January 2015 was "unfair"; she also testified that she had received positive feedback from Dow Corning managers

and channel project partners up to the day she was told she was being redeployed, including a resoundingly positive showing at a marketing meeting that same day where the IAM segment was featured "at the top of the list" in terms of success. It had been "at the bottom of the list" only months before when Schram took over. Nothing in Kelly's testimony suggests that she undertook any investigation of her own to substantiate the supposed decline in performance, or that Kelly relied on anything beyond Govitz's negative views when she "recommended" the redeployment. Also, Dow's own internal HR investigator noted, after discussing the redeployment with Nobels, that Nobels represented that Schram was "bumped" from her IAM position so that it could be taken by another employee under threat of redeployment. That is further evidence that motives other than any substantiated drop in performance animated the decision-maker on the redeployment.

Because there is no evidence that any independent investigation corroborated the abrupt reversal of Govitz's previously positive views on the plaintiff's performance, a jury reasonably could conclude that Govitz merely duped her superiors into replacing Schram on the basis of purported low performance unsubstantiated by anything beyond her own negative review, manufactured to oust Schram in retaliation for her absence on medical leave. Therefore, the defendant may be held accountable under the "cats paw" theory for a decision that could be found to have been driven, or at least instigated, entirely by Govitz's retaliatory animus, regardless of the fact that other managers in the company nominally "signed off" on the decision to redeploy the plaintiff.

Finally, other factual circumstances adequately suggest that the negative performance reviews delivered in December 2014 and January 2015 by Govitz were merely pretextual and concocted to cover her unlawful retaliatory animus toward Schram due to her exercise of her rights

under the FMLA.  The discreet performance lapses relied upon by the defendant — comments to Schram by Govitz and another Dow manager about revisions to one white paper and one segment of a presentation slide show — readily could be found by a jury to be inconsequential next to the plaintiff's demonstrated performance in "turning around" the IAM segment in late 2014, in just a few short months, which was supported by Govitz's positive mid-year review of Schram, and by comments made to Schram by other managers and channel project partners.  Kelly's comment to Schram that the 2015 review was unfounded and "unfair" also calls into question the credibility of Govitz's abruptly soured view.  And Govitz's condescending comments to Schram in a meeting with co-workers, mocking her impaired vision just four days after she returned to work, also suggest that Govitz was preoccupied with Schram's impairment and her absence from work, not with the actual performance of her duties.  At a minimum, the record sufficiently impeaches the credibility of the negative performance evaluation on which the defendant relies to establish a non-discriminatory basis for the termination, and the Sixth Circuit has found on similar facts that the credibility of the basis for the dismissal was for the jury to weigh.  *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 382 (6th Cir. 2017).  The plaintiff has advanced sufficient evidence to put at issue whether her redeployment for "poor performance" was supported by any credible basis in fact, and whether concern with her performance was the actual motive that drove Govitz in agitating for Schram's ouster.

The record evidence adequately establishes factual disputes that require a trial on the FMLA retaliation count.

## B. WDCA Retaliation

The Michigan Worker's Disability Compensation Act prohibits an employer from "discharg[ing] an employee or in any manner discriminat[ing] against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act." Mich. Comp. Laws § 418.301(13). "To establish a *prima facie* case of retaliation under the WDCA, an employee who has suffered a work-related injury must present evidence: (1) that the employee asserted a right to obtain necessary medical services or actually exercised that right, (2) that the employer knew that the employee engaged in this protected conduct, (3) that the employer took an employment action adverse to the employee, and (4) that the adverse employment action and the employee's assertion or exercise of a right afforded under MCL 418.315(1) were causally connected." *Cuddington v. United Health Services, Inc.*, 298 Mich. App. 264, 275, 826 N.W.2d 519, 525 (2012).

The defendant contends that the WDCA retaliation claim must be dismissed because the plaintiff has failed to show that she engaged in any "protected activity" pertinent to the WDCA, or that her employer was aware of any such conduct, or that the defendant ever took any adverse action against the plaintiff in response to any such conduct. The Court disagrees.

The plaintiff has put forth sufficient evidence to allow a jury reasonably to conclude that Govitz unlawfully instigated her redeployment because she resented Schram's exercise of her right to seek necessary medical treatment for her work-related eye injury. It is undisputed that the plaintiff exercised her right to seek medical treatment when she took at least 10 days of medical leave to receive surgery for and to recover from a detached retina. The defendant contends that there

is "no evidence" that the injury was "work related," but that position necessarily ignores the plaintiff's own testimony that the eye injury was caused by a piece of luggage that struck her directly over her eye while she was traveling by air on a business trip. It also is undisputed that Schram told Govitz she would be on medical leave to receive treatment for her eye injury. Govitz's knowledge that the injury was work-related reasonably could be inferred by the jury based on the plaintiff's testimony that Govitz said to the plaintiff, "You're not going to pin this on me," which easily could be understood to indicate Govitz's concern about scrutiny of the circumstances of the injury that would occur at a company safety meeting.

For the same reasons discussed above, the plaintiff has submitted sufficient evidence to establish a causal link between the plaintiff's absence for needed medical treatment and her redeployment soon after she returned from leave, and to rebut the defendant's claim that the redeployment was non-discriminatory and justified by purported poor performance. The defendant's congruent arguments raised in opposition to the FMLA retaliation claim fail as applied to this claim, for the same reasons discussed above.

## C. PWDCRA Claim

The plaintiff's claim for disability discrimination is brought under the Michigan Persons With Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101, *et seq*. That statute "substantially mirrors" the Americans with Disabilities Act (ADA). *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012). And claims brought under it "essentially track those under the ADA." *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 433 (6th Cir. 2014) (quotations and alterations omitted).

To prove a violation of the PWDCRA, a plaintiff must show "(1) that he is disabled as defined in the act, (2) that the disability is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute." *Peden v. City of Detroit*, 470 Mich. 195, 204; 680 N.W.2d 857, 863 (2004) (quotation marks, citation, and brackets omitted). As with the ADA, the definition of "disability" includes being "regarded as" disabled. Mich. Comp. Laws § 37.1103(d)(iii); *see also* 42 U.S.C. § 12102(1).

Schram alleges that Joy Govitz perceived that she had a disability and took adverse action against her as a result. Dow Corning argues that the disability discrimination claim must be dismissed because the plaintiff has failed to offer any evidence that she ever was "disabled," or perceived by her employer to be disabled. Schram's claim is circumstantial. The Court assesses the viability of such claims using the *McDonnell Douglas* burden-shifting analysis. *Demyanovich*, 747 F.3d at 433. Under the *McDonnel Douglas* structure, "the employee has the initial burden of establishing [her] *prima facie* case; if [s]he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual." *Id.* at 427.

Schram has put forth sufficient evidence to sustain her claim that Govitz discriminated against her because of her actual or perceived visual impairment resulting from the eye injury and surgery. "To establish a *prima facie* case of disability discrimination under [the ADA or the PWDCRA], 'a plaintiff must show that 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.'"

*Gamble v. JP Morgan Chase & Co.*, 689 F. App'x 397, 402 (6th Cir. 2017) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 258-59 (6th Cir. 2011)).

*First*, the plaintiff has shown that she either had a "disability" or was perceived by Govitz to have an impairment under the pertinent statutory criteria. The parties have not suggested that those standards are differently construed or applied under the ADA and PWDCRA. Under the ADA: "The term 'disability' means, with respect to an individual (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). "For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, *performing manual tasks*, *seeing*, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, *communicating*, and *working*. 42 U.S.C. § 12102(2)(A) (emphasis added). "For purposes of paragraph (1)(C): (A) An individual meets the requirement of being regarded as having such 'an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). Subsection (1)(C), concerning "perceived" impairments, does "not apply to impairments that are transitory and minor," which are defined as impairments "with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).

The plaintiff's testimony that she had no vision in her left eye for weeks following her surgery, and that it took more than six months for her vision to return to near normal, adequately establish that she suffered from a condition that substantially limited the major life activities of

"seeing," "communicating," and "working," as well as "performing manual tasks," such as driving. The plaintiff also has offered sufficient proof that she was "perceived" by Govitz to have an impairment, because it is undisputed that Govitz knew the plaintiff would be absent from work for eye surgery to correct a detached retina, and Schram's request for a large computer monitor) which Govitz resisted), coupled with Govitz's comments mocking the plaintiff's limited vision the week after she returned to work, demonstrate that Govitz was aware that the limitation persisted after the plaintiff returned from leave. The plaintiff testified that it took more than six months for her vision to return to near normal. Her impairment persists even today, because she still cannot drive at night due to degraded visual acuity. She still is restricted from flying and from engaging in physical activities that pose a risk of further injury to her eye. The record therefore sufficiently suggests that the impairment was not "transitory."

*Second*, the plaintiff's qualifications for the IAM regional marketing position amply are established by her decade of marketing experience with Dow Corning before reprising the role, including previously having worked in the same position, demonstrably with great success. Govitz's aggressive efforts to recruit the plaintiff back into the job, after Kelly recommended Schram as a candidate for it, also support the conclusion that she was well qualified. And that conclusion is bolstered by the "rave reviews" and "kudos" Schram received from Govitz and other Dow Corning managers, as well as the channel project partners that she served, right up to the day she was notified by Govitz that she was being "redeployed" due to a purported lack of aptitude for the job.

*Third*, the plaintiff has put forth sufficient evidence that she suffered an "adverse action," as that term is construed under the ADA, when she was transferred from a permanent position in the IAM regional marketing role to a temporary job, from which she predictably was terminated one

-34-

year later. The Supreme Court has held that where an employee was denied a permanent, tenured position and given notice that he was reassigned to a limited term position that would end in a year, the action was sufficiently adverse to support a discrimination claim. *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 305 (2d Cir. 2017) ("The Supreme Court's conclusion that a discrimination claim accrues upon notice of termination, rather than upon the implementation of that decision, necessarily implies that the notification of termination qualifies as an adverse employment action." (citing *Delaware State College v. Ricks*, 449 U.S. 250 (1980)); *see also Green v. Brennan*, --- U.S. ---, 136 S. Ct. 1769, 1782 (2016) ("[A]n ordinary wrongful-discharge claim accrues — and the limitations period begins to run — when the employer notifies the employee he is fired, not on the last day of his employment."). Moreover, the "redeployment" of a 29-year career employee from a permanent position to a temporary job that was scheduled to end within a year certainly qualifies as "a tangible change in working conditions that produces a material employment disadvantage [and] affect[ed] [her] future career prospects." *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015).

*Fourth*, the plaintiff has shown that her employer — including Govitz and Kelly — knew about her disability, based on the circumstances discussed in detail above.

*Fifth*, the plaintiff has demonstrated that the position remained open until it was filled by a replacement — Shearer. The defendant contends that Schram was not "replaced" and that her position was "eliminated" by a reduction in force. But that position is belied by Shearer's and Velasquez's testimony that Shearer assumed all of Schram's duties and held the same job title that Schram had after he took her position. The defendant contends that Shearer carried on performing certain other obligations from his position at Multibase, but those duties, which are not described

in any detail in the record, appear to have been transient and not made a permanent feature of the IAM regional marketing role: Velasquez testified that his "extra" duties terminated within six months after Shearer started the IAM job. On those facts, a jury reasonably could conclude that the plaintiff was "replaced" by Shearer and that her position was not, as the defendant contends, "eliminated" as part of the global RIF. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.").

Finally, the plaintiff has offered sufficient evidence of a causal connection between her disability and her redeployment, because, for all the reasons discussed above, the jury reasonably could conclude that Govitz instigated and agitated for her reassignment based on unlawfully discriminatory resentment toward the plaintiff after she took medical leave to obtain treatment for her debilitating eye injury. *Demyanovich*, 747 F.3d 433 ("[The plaintiff's disability was a 'but for' cause of his termination: He would not have been terminated had he not asked about taking leave to treat his medical conditions.").

The defendant's arguments relating to causation, nominal responsibility for the redeployment decision, and pretext all are without merit, for the same reasons discussed above.

### D. Gender Discrimination

Schram alleges that her redeployment and replacement by a male (Gifford Shearer) violated the Michigan Elliott-Larsen Civil Rights Act. *See* Mich. Comp. Laws § 37.2202(1)(a)) (prohibiting employment discrimination "because of . . . sex"). The defendant contends that the gender

discrimination claim must be dismissed because the plaintiff has failed to show that she was replaced by a male or treated differently from any similarly situated male. The defendant also argues that the plaintiff has not established any causal connection between her sex and any adverse action, or that the defendant's placement of the plaintiff on a "redeployment list" in December 2014 was mere pretext to cover unlawful discrimination.

Again, the the *McDonnell Douglas* framework comes into play. The *prima facie* case consists of proof that "(1) [the plaintiff] was a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) others, similarly situated and outside the protected class, were treated differently." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 653 (6th Cir. 2012) (citing *Town v. Mich. Bell Telephone Co.*, 455 Mich. 688, 568 N.W.2d 64 (1997)).

The plaintiff has substantiated her claim for gender discrimination. It is undisputed that the plaintiff is a member of a protected class (female). For all of the same reasons discussed above, the record adequately demonstrates that the plaintiff was subjected to an "adverse action" when she was transferred from her permanent IAM marketing role to a temporary position, from which she later was terminated when the position expired, and that she was qualified for the IAM regional marketer role.

The plaintiff also has submitted sufficient evidence from which a jury reasonably could conclude that the male employee who replaced Schram was treated more favorably than she was, since he was not terminated (in fact was given her job after she was "bumped" from it), and was paid more than $40,000 more, despite the admitted fact that he had no experience in IAM marketing

before 2015, and that his other marketing experience spanned at most three years. Contrast that with Schram's more than a decade of experience in the IAM role and related positions with Dow.

The plaintiff also has offered evidence that the defendant's stated reasons for its actions — poor performance — was a pretext for unlawful discrimination. The jury could conclude — with good reason — that the purported poor performance cited by the defendant as grounds for the redeployment was mere pretext fabricated and relied upon to appease Velasquez's unlawfully discriminatory desire to favor his male subordinate and acquaintance Shearer, by "bumping" Schram out of her job in order to make way for Shearer. In particular, Velasquez's true underlying motivation is apparent in the mid-December email exchange where he pushed for an earlier notification to Schram, presumably because Shearer was himself already under a 60-day redeployment clock, as a result of the "redistribution" of the duties of his existing position at Multibase.

Velasquez asserts that it was "not his decision" to replace Schram with Shearer, and that Kelly made the call; but that testimony is belied by Kelly's insistence that she was not involved, which is corroborated by her conspicuous silence during the December email exchange, contrasted with Velasquez's active participation and insistence on advancing the timeline. Velasquez's role in the decision also is substantiated by the email sent by Shearer to the Dow Corning human resources department stating that Shearer had consulted his manager and that "he" (meaning Velasquez), had approved the hiring and relocation process.

The defendant's arguments relating to the purported RIF justification, absence of causation, and non-discriminatory motive all are without merit, for the same reasons discussed above. Moreover, the evidence of pretext as to the gender discrimination claim also is bolstered by Nobels's

admission, documented by Dow's HR investigator, that Schram deliberately was "bumped" from her job so that she could be replaced by a male, which turned out to be Shearer. And Velasquez's underlying motive of displacing Schram to favor Shearer is evident from his attempts to accelerate the timeline for notifying Schram about the redeployment.

## III.

The plaintiff has offered sufficient evidence to defeat summary judgment and proceed to trial on her pleaded claims. She did not plead or establish an FMLA interference claim, however, and will not be allowed to advance that theory at trial.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #36] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: January 8, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 8, 2018.

s/Susan Pinkowski
SUSAN PINKOWSKI